

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

---

No. 02-21-00135-CV

---

BIG BLUE PROPERTIES WF, LLC, Appellant

V.

WORKFORCE RESOURCE, INC., D/B/A WORKFORCE SOLUTIONS NORTH
TEXAS A/K/A TEXAS WORKFORCE SOLUTIONS, Appellee

---

On Appeal from the 78th District Court
Wichita County, Texas
Trial Court No. DC78-CV2020-0243

---

Before Sudderth, C.J.; Kerr and Wallach, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

Appellant Big Blue Properties, LLC sued appellee Workforce Resource, Inc., d/b/a Workforce Solutions North Texas a/k/a Texas Workforce Solutions to collect unpaid rent due under three commercial leases. Workforce Resource filed a plea to the jurisdiction claiming that, as a local governmental entity, it is immune from suit and that Section 271.152 of the Texas Local Government Code did not waive its immunity. *See* Tex. Loc. Gov't Code Ann. § 271.152. The trial court agreed, granted the plea, and dismissed Big Blue's breach-of-contract claim. Big Blue has appealed, arguing in four issues that the trial court erred by granting Workforce Resource's jurisdictional plea because Section 271.152 waived Workforce Resource's governmental immunity. But because the leases at issue are not contracts for the provision of services to Workforce Resource, Section 271.152 does not apply and thus does not waive Workforce Resource's immunity. *See id.* §§ 271.151(2)(A), .152. Accordingly, we will affirm the trial court's judgment.

## I. Background

In November 2017, Workforce Resource—a local-workforce-development organization—solicited proposals to consolidate its operations in one place.[1] The

---

[1]Workforce Resource serves some eleven North Texas counties and "is led by a local board consisting of 27 volunteer members, a majority of which come from private industry. It is part of a statewide system of local boards which set policy and oversee expenditures of funds in their individual areas. These boards are non-profit and receive funding from the U.S. Department of Labor through the Texas

2

solicitation provided that "[t]he [Workforce Resource] Board reserves the right to negotiate the final terms of any and all contracts or agreements that may be initiated" and stated that it was "not to be construed as a purchase agreement or contract or as a commitment of any kind." In response to this solicitation, Big Blue offered to lease portions of its building in Wichita Falls, Texas.

On June 28, 2018, Workforce Resource's board unanimously voted to proceed to lease negotiations with Big Blue. Later that day, Workforce Resource's executive director, Ramona Statser,[2] contacted Big Blue to inform it that Workforce Resource would "begin negotiations" with Big Blue. Soon thereafter, on July 20, 2018, Statser signed the first of three lease agreements with Big Blue on Workforce Resource's behalf. Statser went on to sign two more leases with Big Blue for two other spaces in its building—again on Workforce Resource's behalf—on October 31, 2018, and January 25, 2019.

All three leases differed from the original proposal Big Blue had presented to Workforce Resource's board. Some of those differences included: (1) the leased space's square footage; (2) the leased space's floor plans; (3) the lease term; (4) the security-deposit requirements; (5) the lease-termination options; (6) the rental rates;

---

Workforce Commission." Workforce Solutions North Texas, https://ntxworksolutions.org/about-us/ (last visited May 24, 2022).

[2]As the executive director, Statser was a staff member who reported to the board.

(7) guarantees regarding the leased space's condition; and (8) the leased space's parking availability. None of the finalized leases containing these changes was presented to Workforce Resource's board for final approval. But despite the board's lack of affirmative assent, Workforce Resource began moving its board and executive staff into one of the three leased spaces in fall 2018.

None of the three written leases required either Big Blue or Workforce Resource to provide any goods or services to the other; they provided for the payment of rent in exchange for a leasehold interest in the property, which Big Blue was to maintain.[3] The lease agreements signed by Big Blue and Statser provided that "[Workforce Resource] has inspected the leased premises and accepts it in its present (as-is) condition." The lease agreements further stated that "[the leases] contain[ ] the entire agreement between Landlord and Tenant and may not be changed except by written agreement." Although Statser and Big Blue orally negotiated for Big Blue to conduct property renovations and construction, and although Big Blue performed some of that work, those side agreements were never incorporated into the written lease agreements or otherwise reduced to writing.

Workforce Resource moved into one of the leased spaces and fulfilled its rent obligations for that space from September 2018 through summer 2019. But after Workforce Resource's management changed, it stopped paying rent and sought

---

[3]Big Blue does not argue that maintenance was a service.

release from all three lease agreements. Ultimately, at the end of 2019, Workforce Resource vacated the one leased space it had moved into.

Big Blue sued Workforce Resource for breach of contract to collect the rent due under all three leases, pleading that Workforce Resource was a local governmental entity for which immunity had been waived under Local Government Code Section 271.152. Workforce Resource filed a plea to the jurisdiction challenging the jurisdictional facts and arguing that Section 271.152 did not waive its immunity.

It is undisputed that Workforce Resource and Big Blue entered into three written contracts that contained each party's basic obligations. But the parties disagree on four issues: (1) whether Workforce Resource was authorized to enter into the lease agreements; (2) whether the lease agreements contained the "essential terms of the agreement"; (3) whether the lease agreements were contracts for the provision of services to Workforce Resource; and (4) whether Statser's negotiation and signature, without board approval, constituted "proper execution of the lease agreements."

The trial court granted Workforce Resource's plea to the jurisdiction and dismissed Big Blue's breach-of-contract claim, its only cause of action.[4] This appeal followed.

---

[4]Big Blue's pleading also alleged a suit on a sworn account, which is not an independent cause of action but a procedural device for proving certain contract disputes. *See Beach St. Foods, Inc. v. Grandy's, LLC*, No. 02-20-00135-CV, 2022 WL 187988, at *3 (Tex. App.—Fort Worth Jan. 20, 2022, no pet.) (mem. op.).

## II. Governmental Immunity and Standard of Review

"Sovereign immunity and its counterpart, governmental immunity, exist to protect the State and its political subdivisions from lawsuits and liability for money damages." *Mission Consol. ISD v. Garcia*, 253 S.W.3d 653, 655 (Tex. 2008). Sovereign immunity protects the State from lawsuits to which it has not consented while governmental immunity provides similar protection to the State's political subdivisions. *City of Cleburne v. RT Gen., LLC*, No. 10-20-00037-CV, 2020 WL 7394519, at *2 (Tex. App.—Waco Dec. 16, 2020, no pet.) (mem. op.). Workforce Resource is a local governmental entity and is entitled to governmental immunity. *See Arbor E&T, LLC v. Lower Rio Grande Valley Workforce Dev. Bd., Inc.*, 476 S.W.3d 25, 35–38 (Tex. App.—Corpus Christi–Edinburg 2013, no pet.); *see also Dall./Fort Worth Int'l Airport Bd. v. Vizant Techs., LLC*, 576 S.W.3d 362, 366 (Tex. 2019) ("Governmental immunity generally protects local governmental entities against both lawsuits and legal liabilities.").

Governmental immunity comprises two components: immunity from suit and immunity from liability. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004) (op. on reh'g). Immunity from suit deprives the trial court of subject-matter jurisdiction. *Id.*

A party filing a plea to the jurisdiction seeks to defeat a claim by challenging the trial court's subject-matter jurisdiction. *See Bland ISD v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). The plaintiff bears the burden of establishing the trial court's jurisdiction, a

6

burden that includes demonstrating the government's waiver of immunity once it has been raised. *See Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 550 (Tex. 2019).

A governmental entity asserting governmental immunity may challenge the plaintiff's pleadings or, as here, the existence of jurisdictional facts. *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 378 (Tex. 2009). When the governmental entity challenges subject-matter jurisdiction based on disputed facts, the dispute may require resolution by the factfinder. *Miranda*, 133 S.W.3d at 226. But whether undisputed evidence—as presented here—establishes a trial court's subject-matter jurisdiction is a legal question that we review de novo. *See id.*

### III. Analysis

In four issues, Big Blue argues that Texas Local Government Code Section 271.152 waives Workforce Resource's immunity and that the trial court thus erred by granting Workforce Resource's plea to the jurisdiction because (1) Workforce Resource was authorized to enter into the leases; (2) Workforce Resource "properly executed" the leases; (3) the leases are contracts for the provision of services; and (4) there is no legal impediment to enforcing the leases. Because we conclude that the leases are not contracts for the provision of services to Workforce Resource, issue three is dispositive, and we need not address Big Blue's remaining issues. *See* Tex. R. App. P. 47.1; *Lance v. Robinson*, 543 S.W.3d 723, 740 (Tex. 2018).

## A. Waiver of Immunity and the Local Government Code

Governmental immunity may be waived only with the legislature's express consent. *Garcia*, 253 S.W.3d at 655. The legislature waives governmental immunity through statutes, which courts narrowly construe to ensure "clear and unambiguous" waivers. *Id.*; *see* Tex. Gov't Code Ann. § 311.034. Chapter 271 of the Texas Local Government Code waives governmental immunity for certain contract claims against local governmental entities. *See* Tex. Loc. Gov't Code Ann. § 271.152. For waiver to apply, a claim must arise from a "contract subject to this subchapter." *Id.* A "contract subject to this subchapter" means a contract that (1) is in writing; (2) states the "essential terms of the agreement"; (3) is an agreement for the provision of "goods or services" to the governmental entity;[5] and (4) is "properly executed" on the governmental entity's behalf. *Id.* § 271.151(2)(A) (defining "contract subject to this subchapter"); *Dall./Fort Worth Int'l Airport Bd.*, 576 S.W.3d at 368.

Chapter 271 was meant to "loosen the [governmental] immunity bar so that *all* local governmental entities that have been given or are given the statutory authority to enter into contracts shall not be immune from suits arising from those contracts." *Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 838 (Tex. 2010) (quoting *Ben Bolt–Palito Blanco Consol. ISD v. Tex. Pol. Subdivisions Prop./Cas. Joint Self-*

---

[5]Big Blue does not argue that any goods were involved, so we focus on the "services" aspect of Section 271.151(2)(A)'s "goods or services" language. *See* Tex. Loc. Gov't Code Ann. § 271.151(2)(A).

*Ins. Fund*, 212 S.W.3d 320, 327 (Tex. 2006)). But the legislature did not intend to sweep all governmental contracts within Chapter 271's immunity waiver. *See Water Expl. Co. v. Bexar Metro. Water Dist.*, 345 S.W.3d 492, 500–01 (Tex. App.—San Antonio 2011, no pet.). Applying the requisite "narrow" reading of the waiver, courts have consistently interpreted "goods or services" to require some affirmative act beyond conveying leasehold property interests.[6] *See, e.g.*, *Triple BB, LLC v. Vill. of Briarcliff*, 566 S.W.3d 385, 395 (Tex. App.—Austin 2018, pet. denied) (op. on reh'g); *Hoppenstein Props., Inc. v. McLennan Cnty. Appraisal Dist.*, 341 S.W.3d 16, 19–20 (Tex. App.—Waco 2010, pet. denied) (op. on reh'g); *City of San Antonio v. Reed S. Lehman Grain, Ltd.*, No. 04-04-00930-CV, 2007 WL 752197, at *2 n.2 (Tex. App.—San Antonio Mar. 14, 2007, pet. denied) (mem. op. on reh'g). The affirmative act must be required by the written contract, and it must result in a direct benefit to the governmental entity by conferring "goods or services" upon it. *See Lubbock Cnty. Water Control & Improvement Dist. v. Church & Akin, L.L.C.*, 442 S.W.3d 297, 302–03 (Tex. 2014). Thus, where a written contract does not require the provision of goods or services to the governmental entity's direct benefit, Chapter 271 does not waive the entity's immunity. *See id.*

---

[6]The Texas Supreme Court has recognized that leasehold interests themselves usually do not constitute contracts for the provision of "goods or services" under Chapter 271. *See Wasson Ints., Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 437 (Tex. 2016) ("[G]enerally, contracts for land leases . . . are not covered by Chapter 271.").

## B. Application

Big Blue principally relies on *Houston Community College System v. HV BTW, LP*, 589 S.W.3d 204 (Tex. App.—Houston [14th Dist.] 2019, no pet.). There, the Houston Community College System granted HV BTW, LP an easement on the system's property. *Id.* at 208. As consideration for the easement, HV agreed to construct parking facilities on the property at its sole cost and expense. *Id.* After signing the contract, HV spent over $500,000 in various costs directly associated with its contractual development obligations. *Id.* To obtain approval for the construction, HV needed the system's signature, but when the system refused to sign, HV sued it for breach of contract. *Id.* The trial court implicitly denied the system's plea to the jurisdiction and granted HV's summary-judgment motion. *Id.*

The court of appeals affirmed the trial court's denial of the system's plea to the jurisdiction, holding that the system had waived its governmental immunity by entering into "an agreement for services within the purview of [C]hapter 271." *Id.* at 212. Critical to the court's decision was the fact that HV's "construction of parking facilities as consideration" for the easement constituted a "service" to the system's direct benefit. *Id.*

Here, in contrast, Big Blue was not contractually obligated to perform any services. Big Blue, however, argues that the leases required it to perform services in the form of "construction services to make the leased premises ready for [Workforce

10

Resource]," pointing to each lease's delay-in-occupancy provision, which provides that

> If Tenant is unable to occupy the leased premises on the Commencement Date because of *construction on the leased premises to be completed by the Landlord that is not substantially complete* . . . . the Commencement Date will automatically be extended to the date Tenant is able to occupy the Property . . . . If Tenant is unable to occupy the leased premises after the 90th day after the Commencement Date because of *construction on the leased premises to be completed by Landlord that is not substantially complete* . . . Tenant may terminate this lease by giving written notice to Landlord before the leased premises become[s] available to be occupied by Tenant and Landlord will refund to Tenant any amounts paid to Landlord by Tenant. [Emphases added.]

But a private company is not contractually obligated to provide services to a local governmental entity when the company can choose not to provide the services without breaching the contract. *See Church & Akin*, 442 S.W.3d at 303 (holding that a private marina was not obligated to provide services to a local governmental entity when the marina "could have elected not to use the premises for any purpose"). The leases did not require Big Blue to provide construction services, and the leases could have been fulfilled without any such construction. Thus, while Workforce Resource might have benefitted from Big Blue's construction services, it had no right to them under the leases. And "[w]hen a party has no right under a contract to receive services, the mere fact that it may receive services as a result of the contract is insufficient to invoke [C]hapter 271's waiver of immunity." *Id.*

Additionally, there was no "meeting of the minds" about what construction Big Blue would complete. Rather, Big Blue's owner testified that, after the contracts were

11

signed, the parties "would have the back and forth over what Big Blue would do under the lease as far as the build out." And, even if Big Blue had assumed specific construction obligations through oral negotiation, Big Blue never reduced those obligations to writing or incorporated them into the leases with written addenda that our sister courts have held can satisfy Chapter 271.

For example, in the distinguishable circumstances of *Hoppenstein Properties*, the McLennan County Appraisal District (MCAD) contracted to lease property from Hoppenstein, a private entity. 341 S.W.3d at 18. The parties supplemented their written contract with a written "construction addendum" that required Hoppenstein to complete specific renovations on the leased property.[7] *Id.* After the renovations were completed, MCAD occupied the leased premises. *Id.* at 19. But after a dispute arose, Hoppenstein sued for breach of contract. *See id.* MCAD asserted governmental immunity in a plea to the jurisdiction, which the trial court granted. *Id.* at 18–19.

The court of appeals initially affirmed but ultimately reversed on rehearing in light of the Texas Supreme Court's then-recent decision in *Kirby Lake Development. Id.* at 18, 20 (citing *Kirby Lake Dev.*, 320 S.W.3d at 839). In reversing, the court of appeals held that MCAD had waived its governmental immunity by entering into a contract for services. *Id.* at 20. Critical to that holding was the fact that the written contract—

---

[7]The "construction addendum" in *Hoppenstein Properties* required the company to (1) remove interior walls and construct new ones according to an attached floor plan, (2) install new carpet and tile, and (3) modify the building's HVAC system. 341 S.W.3d at 18.

as supplemented in writing—required Hoppenstein "to renovate the premises for MCAD," a "service" that directly benefitted the appraisal district. *Id.* As with *Houston Community College*, *Hoppenstein Properties* is distinguishable. In both cases, written contracts obligated private companies to perform specific "services"—in the form of construction and development—to a governmental entity's direct benefit. Here, however, Big Blue had no obligation under the contracts to perform any construction, renovation, or other property development. And even if Big Blue later agreed, during oral negotiations, to complete certain construction or renovation work for Workforce Resource, those agreements were never reduced to writing.

Instead, this case is similar to *Triple BB*. There, the Village of Briarcliff—through a written contract—obtained an easement to construct a water line on a marina's land in exchange for granting the marina a license to display a billboard on a lot owned by the Village and for agreeing to repair the marina's parking lot at the Village's expense. *Triple BB*, 566 S.W.3d at 391. A few years later, the marina's owners, the Clendenins, sold the marina and their interest in the contract to Triple BB, after which the Village conveyed the lot to another couple, the Flowerses. *Id.* The Flowerses later sold their interest to Malcolm Phillips, who demanded that Triple BB remove the billboard. *Id.* In response, Triple BB sued Phillips and the Village. *Id.* The trial court granted Phillips's summary-judgment motion and the Village's plea to the jurisdiction. *Id.*

13

The court of appeals rejected Triple BB's argument that the Clendenins' easement conveyance alone constituted a "service" to a governmental entity under Chapter 271. *Id.* at 394–95. Instead, the court of appeals held that "[b]y conveying an easement, the Clendenins granted the Village a legal right to use their land in a certain way. They made no promise to perform an act, and thus the contract for easement is not a contract for service." *Id.* at 395 (citations omitted). Accordingly, Chapter 271 did not waive the Village's immunity. *Id.*

Here, the lease agreements between Big Blue and Workforce Resource do not constitute contracts for services. The written leases gave Workforce Resource nothing more than leasehold property interests. Such conveyances alone are insufficient to constitute the provision of services.

The lease agreements here also explicitly disclaimed any construction or renovation obligation on Big Blue's part: "[Workforce Resource] has inspected the leased premises and *accepts it in its present (as-is) condition.*" The leases' "as-is" provisions distinguish this case from the written parking-facilities obligation in *Houston Community College. See* 589 S.W.3d at 212. Further, the lease agreements here state, "[the leases] contain[ ] the entire agreement between Landlord and Tenant and may not be changed except by written agreement." No written amendment was ever incorporated into the agreements; Big Blue and Statser *orally* negotiated for certain work.

Because the leases merely conveyed leasehold property interests to Workforce Resource—without requiring that Big Blue perform some "service" for Workforce

14

Resource's benefit—and because no written addendum for services was executed, we hold that the leases are not contracts for the provision of services to Workforce Resource and that Section 271.152 thus does not waive Workforce Resource's immunity. *See* Tex. Loc. Gov't Code Ann. §§ 271.151(2)(A), .152. Accordingly, the trial court did not err by granting Workforce Resource's plea to the jurisdiction, and we overrule Big Blue's third issue.

## IV. Conclusion

Having concluded that the trial court did not err by granting Workforce Resource's plea to the jurisdiction, we affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: June 2, 2022